No. 24-3454

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

NATHAN ROBERTS, and FREEDOM TRUCK DISPATCH, LLC, on behalf of himself and all others similarly situated,

*Plaintiffs-Appellants*,

v.

PROGRESSIVE PREFERRED INSURANCE COMPANY; PROGRESSIVE CASUALTY INSURANCE COMPANY; CIRCULAR BOARD INC., originally named Circular Board, LLC,

*Defendants-Appellees*.

Appeal from the United States District Court for the Northern District of Ohio at Cleveland, No. 1:23-cv-01597
The Honorable Patricia A. Gaughan

**AMICUS BRIEF OF LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW, SOUTHERN POVERTY LAW CENTER, THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AND LATINOJUSTICE PRLDEF SUPPORTING APPELLEES AND AFFIRMANCE**

Dariely Rodriguez
Kathryn J. Youker
Sabrina Talukder
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, D.C. 20005
DRodriguez@lawyerscommittee.org
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Keith Harrison
Amy Pauli
Derick Dailey
Mary Marston
Jon Del Barrio
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
kharrison@crowell.com

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-3454 _____          Case Name: Roberts et. al v. Progressive et. al. _____

Name of counsel: Keith Harrison _____

Pursuant to 6th Cir. R. 26.1, Lawyer's Committee for Civil Rights Under Law _____

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ 10/25/24 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Keith J. Harrison _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-3454_____    Case Name: Roberts et. al v. Progressive et. al._____

Name of counsel:  Keith J. Harrison _____

Pursuant to 6th Cir. R. 26.1, LatinoJustice PRLDEF _____
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

### CERTIFICATE OF SERVICE

I certify that on _____ 10/25/24 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Keith J. Harrison _____
_____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-3454_____          Case Name: Roberts et. al v. Progressive et. al._____

Name of counsel:  Keith J. Harrison_____

Pursuant to 6th Cir. R. 26.1, Southern Poverty Law Center_____
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

### CERTIFICATE OF SERVICE

I certify that on _____10/25/24_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Keith J. Harrison_____
_____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-3454      Case Name: Roberts et. al v. Progressive et. al.

Name of counsel:  Keith J. Harrison

Pursuant to 6th Cir. R. 26.1,  NAACP
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

## CERTIFICATE OF SERVICE

I certify that on _____ 10/25/24 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/

s/Keith J. Harrison

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS  AND FINANCIAL INTEREST ............................................................. i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS CURIAE .................................................... 1

INTRODUCTION ................................................................................ 3

ARGUMENT ....................................................................................... 5

I.    COURTS IN CASES CHALLENGING PRIVATE REMEDIAL GRANTS AND PROGRAMS DESIGNED TO ADVANCE ECONOMIC OPPORTUNITY HAVE REFUSED TO REWRITE THE ARTICLE III STANDING REQUIREMENT. ............................................................................ 5

    A.    Roberts' theory of standing would rewrite the Article III requirement and create absurd results. ............................... 6

    B.    Courts have rejected similarly weak standing allegations in cases challenging remedial private grants that advance racial equity. ....................................................................... 8

    C.    Beyond private grants, courts routinely dismiss similarly thin standing allegations that seek to undermine efforts to advance equal opportunities. .......................................... 10

II.    REWRITING ARTICLE III'S STANDING REQUIREMENTS WOULD ENABLE THE WEAPONIZATION OF SECTION 1981 AND UNDERMINE THE CONGRESSIONAL INTENT OF THE ACT. ............................................................................. 14

CONCLUSION .................................................................................. 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexandre v. Amazon.com, Inc.*,
No. 22-CV-1459, 2024 WL 2445705 (S.D. Cal. May 23, 2024) ...................9, 10

*Barbour v. Merrill*,
48 F.3d 1270 (D.C. Cir. 1995) .............................................................................7

*Bolduc v. Amazon*,
No. 22-CV-00615, 2024 WL 1808616 (E.D. Tex. Apr. 25, 2024) ...........8, 9, 10

*Coalition for T.J. v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023) ...............................................................................3

*Do No Harm v. Nat'l Assoc. of Emergency Med. Techs.*,
No. 24-CV-11, 2024 WL 245630 (S.D. Miss. Jan. 23, 2024) .....................12, 13

*Goodman v. Lukens Steel Co.*,
482 U.S. 656, 673 (1987) ...................................................................................21

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .............................................................................................5

*John Doe v. Kamehameha Schs.*,
470 F.3d 827 (9th Cir. 2006) (en banc) .......................................................14, 15

*John Doe v. N.Y. Univ.*,
No. 23-CV-10515, 2024 WL 2847368 (S.D.N.Y. May 30, 2024) ..............11, 12

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968) .....................................................................................14, 20

*Murray v. Thistledown Racing Club, Inc.*,
770 F.2d 63 (6th Cir. 1985) ...............................................................................20

*Patterson v. McLean Credit Union*,
491 U.S. 164, 219 (1989) ...................................................................................15

*Roberts v. Progressive Preferred Ins. Co.*,
No. 23 CV 1597, 2024 WL 2295482 (N.D. Ohio May 21, 2024) ..................6, 13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...............................................................................4, 5

*United States v. Texas*,
  599 U.S. 670 (2023)...................................................................................5

**Statutes**

42 U.S.C. § 1981 ................................................................................*passim*

**Rules**

Fed. R. App. P. 29(a)(2)..........................................................................1

**U.S. Constitution**

U.S. Const. art. III, § 2, cl. 1 ...................................................................5

**Other Authorities**

Alicia Robb, U.S. Small Bus. Assoc. Office of Advoc., *Financing
  Patterns and Credit Market Experiences: A Comparison by Race
  and Ethnicity for U.S. Employer Firms*,  3 (Feb. 2018) ....................16

Federal Reserve Bank, 2016 Small Business Credit Survey Report on
  Minority Owned Firms (Nov. 9, 2017).................................................17

Federal Reserve Bank, The Federal Reserve 2022 Report on Firms
  Owned by People of Color (June 29, 2022) .......................................18

Gizelle George-Joseph and Daniel Milo, *The Bigger Picture
  Blackwomenomics-Equalizing Entrepreneurship* (2021)..................16

NABA Inc., *Investing in The Future: How Supporting Black Women-
  Owned Businesses and Entrepreneurs Benefits Us All*, Forbes EQ
  Apr. 27, 2023 ......................................................................................19

Vasanth Ganesan et al., *Underestimated start-up founders: The
  untapped opportunity* (2023) .............................................................19

## INTEREST OF AMICUS CURIAE[1]

Formed in 1963, the Lawyers' Committee is a nonpartisan, nonprofit organization that uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. To this end, the Lawyers' Committee has participated in hundreds of cases involving issues related to voting rights, housing, employment, education, and public accommodations. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023); *Am. All. for Equal Rights v. Fearless Fund Mgmt.*, 103 F.4th 765 (11th Cir. 2024); *Am. All. for Equal Rights v. Zamanillo*, 24-cv-00509 (D.D.C.).

The Southern Poverty Law Center ("SPLC") is a nonprofit 501(c)(3) civil rights organization that is a catalyst for racial justice in the South and beyond, working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people. SPLC has participated as counsel or amicus curiae in a range of cases before the U.S. Supreme

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel to a party in this case authored this brief in whole or in part. No party or party's counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief. No person or entity other than the *amici* and their counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief.

Court, federal appellate and district courts, and state courts in its efforts to secure equal treatment and opportunity for marginalized members of society.

The National Association for the Advancement of Colored People ("NAACP") was founded in 1909 and has more than 2,200 local chapters across the country. Its principal objectives are to ensure the political, educational, social, and economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of continued adverse effects of racial discrimination while working toward its elimination. The NAACP is committed to preventing and eradicating systemic discrimination in the marketplace. The NAACP is committed to advancing equity.

Founded in 1972, LatinoJustice PRLDEF's mission is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders. For over fifty years, LatinoJustice has litigated landmark cases and advanced policy reforms in areas of practice, including economic justice, voting rights, and immigrants' rights. LatinoJustice has filed and participated in hundreds of briefs in support of equal opportunity and racial equity, including *Students for*

*Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023); *Coalition for T.J. v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864 (4th Cir. 2023).

## INTRODUCTION

The district court correctly dismissed Nathan Roberts and Freedom Truck Dispatch, LLC's ("Roberts'") lawsuit based on the long-established Article III standing principle that a plaintiff must suffer an injury-in-fact to sue and because Roberts has suffered no injury.  Roberts was not prevented from entering into a contract under Section 1981. He provided no factual evidence that he satisfied the race-neutral requirements of the grant. He also does not dispute that had he applied, he would not have received one of the ten grants notwithstanding the racial criteria. Remarkably, Roberts asserts that he is nonetheless entitled to retrospective relief in the form of compensatory damages, the purpose of which aim to "make whole" a person who has suffered actual discriminatory harm through the loss of a contractual opportunity.  Here, awarding make whole relief to Roberts would place him in an *even better position* than before—an illogical result that could open up the floodgates to baseless lawsuits in direct contravention of the original intent of 42 U.S.C. § 1981.

This court should decline Roberts' invitation to rewrite Article III's standing requirements. Other courts, in similar lawsuits challenging remedial grants and diversity initiatives, have found no standing. Where plaintiffs in such challenges allege they are "able and ready" to compete in programs designed to remedy

systemic barriers to economic opportunity, as in all cases, courts must ensure that the alleged injury is "particularized" and "concrete." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks and citation omitted).

Allowing plaintiffs who can't meet the injury-in-fact requirement for standing to maintain Section 1981 claims would turn the statute on its head. Congress enacted Section 1981 as a remedial law designed to secure the rights of newly emancipated Black citizens who were historically deprived of the rights to make and enforce economic contracts during Reconstruction. The freedom to contract and participate in the economy on equal terms "as is enjoyed by white citizens" was central to overcoming the legacy of slavery and anti-Black economic oppression. The Act's remedial purpose squarely aimed to benefit Black Americans. Its remedial purpose remains vital today when Black, Latino and other communities of color continue to face deeply entrenched barriers to economic opportunities in every facet of day-to-day life resulting from historical and ongoing discrimination. It is that remedial purpose, which is at the very heart of Section 1981, that stands to be undermined in this case. Reversing the district court's decision could chill private remedial efforts across the country that aim to close the very real economic gaps that the historical legacies of slavery, segregation, and racism have created in the United States.

This Court should affirm the district court's dismissal of Roberts' lawsuit for lack of standing.

**ARGUMENT**

## I.    COURTS IN CASES CHALLENGING PRIVATE REMEDIAL GRANTS AND PROGRAMS DESIGNED TO ADVANCE ECONOMIC OPPORTUNITY HAVE REFUSED TO REWRITE THE ARTICLE III STANDING REQUIREMENT.

Article III standing is a "bedrock constitutional requirement that this Court has applied to all manner of important disputes." *See United States v. Texas*, 599 U.S. 670, 675 (2023). It confines federal courts' jurisdiction to "[c]ases" and "controversies." U.S. Const. art. III, § 2, cl. 1. Constitutional standing requires would-be plaintiffs to have suffered an "injury[-]in[-]fact." *Spokeo, Inc.*, 578 U.S. at 338. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The Supreme Court's prudential standing doctrine supplements constitutional standing. It requires courts to decline to review cases that are otherwise within their constitutional purview. Prudential standing requires plaintiffs to allege "a particularized"—rather than a generalized—harm and allege that their own legal rights and interests are at issue. *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (internal quotation marks and citations omitted).

Extending standing to cover Roberts' alleged injury here would disrupt these well-trodden principles of judicial restraint. The district court correctly held that

Roberts lacked standing to seek retrospective or prospective relief concerning either the 2023 Hello Alice grant or any future grants. *Roberts v. Progressive Preferred Ins. Co.*, No. 23 CV 1597, 2024 WL 2295482, at \*7-8 (N.D. Ohio May 21, 2024).

### A. Roberts' theory of standing would rewrite the Article III requirement and create absurd results.

It is uncontested that Roberts did not apply for the grants, that he failed to allege he would have obtained one of the grants in the absence of the race-based eligibility requirements, or that he satisfies any of the five race neutral requirements of the grant. *See* Appellants' Br. 12, 14. Despite multiple opportunities to present more factual allegations, Roberts has only submitted a handful of barebone conclusory allegations as the sole basis of evidence to allege cognizable injury-and-fact. *See* Appellants' Br. at 7. The district court noted that Roberts consistently maintained that all he needs to prove for a cognizable injury-in fact is to simply allege that he was able and ready to apply for the 2023 grant. Mem. Op. & Order RE 51, PageID #612. Even more, Roberts filed his Complaint after the grant application had closed, and Appellees' uncontested affidavit stated that Progressive did not plan to open a similar grant program in the future. For good reason, Roberts acknowledges his claim for injunctive relief was foreclosed. Nonetheless, Roberts advances a meritless theory of standing for compensatory damages, a form of retrospective relief, on an "inability to apply" theory.

Compensatory damages serve an important remedial purpose under Section 1981 as they seek to make the victims of unlawful discrimination whole and restore them to the position they would have been but for the discrimination. *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (explaining that under Section 1981, courts "should fashion" plaintiffs' relief to prove "the most complete make-whole relief possible"). For example, under section 1981, a qualified candidate who applies for but is not hired for a job based on unlawful discrimination could seek back pay to place him or her in the same position as if they had been hired. Under Roberts' theory of standing, a person could obtain back pay for a job for which they were not qualified and never applied.  Such a result would confer standing on anyone, even people who had not applied for the job. As the district court noted, this would cause an unfair windfall for the unqualified plaintiff. *See* Mem. Op. & Order RE 51, PageID #620.

Roberts' lawsuit proposes a standing formula that many other courts have rightly rejected in cases involving grants and programs that seek to advance economic opportunity. Like Roberts, they assert (1) barebone conclusory allegations as the primary evidence for Article III standing and (2) little-to-no allegations or evidence showing the plaintiff satisfied the non-race-based requirements of the challenged equity program. Courts have routinely refused to accept such meager standing allegations because they fail to satisfy the injury-in-fact requirement.

**B.     Courts have rejected similarly weak standing allegations in cases challenging remedial private grants that advance racial equity.**

Multiple courts have already dismissed similar claims by reverse discrimination plaintiffs who were not able to establish standing when challenging private grants that seek to remediate racism's harms because they failed to show they were able and ready to compete for a particular economic opportunity.

For example, in *Bolduc v. Amazon*, the plaintiff challenged, under Section 1981, Amazon's award of $10,000 grants to eligible Black/African American, Hispanic/Latinx, and Native American/Indigenous entrepreneurs in Amazon's Delivery Service Partner ("DSP") program. *Bolduc v. Amazon*, No. 22-CV-00615, 2024 WL 1808616, at *4 (E.D. Tex. Apr. 25, 2024). To be considered for the grants, grantees first had to become Amazon Delivery Service Partners by passing a "multitiered . . . lengthy, competitive, and highly selective" application process. *Id.* DSP is open to all qualifying business owners, regardless of identity.  The grant was designed to provide diverse DSP entrepreneurs with startup funding as they build and scale their businesses, to help reduce the barriers to entry for Black, Latinx, and Native American leaders who want to start their own business. *Id.* The district court dismissed the plaintiff's case on standing, finding that her alleged injuries were hypothetical and conjectural in nature. *Id.*

Like Roberts, the plaintiff alleged she was "able and ready" to compete for Amazon's diversity grant. *Id.* at *2. Yet, she never even applied to be an Amazon

Delivery Service Partner, which was a prerequisite to even being considered for the grant.

The *Bolduc* court found no injury-in-fact.[2] The court explained that it was a "far cry from certainty" that the plaintiff would be selected for the DSP program and that an "unpredictable chain of hypothetical events stands in the way" of her potentially experiencing the alleged discrimination. *Id.* The court further explained that the plaintiff's alleged injuries were "[merely] hypothetical [and] conjectural" and "[insufficient] to establish standing." *Id.* For example, the court found her allegation that she was deterred from applying to become a Delivery Service Partner, which had no racial eligibility criteria, unpersuasive. Put plainly, the court concluded that the plaintiff's alleged injuries were "too theoretical and remote to prop up standing." *Id.* at *7.

A California court, faced with a near-identical challenge to Amazon's diversity grant also dismissed the plaintiff's case for lack of standing. *Alexandre v. Amazon.com, Inc.*, No. 22-CV-1459, 2024 WL 2445705, at *5 (S.D. Cal. May 23, 2024) (holding that the plaintiff's alleged injuries were "merely hypothetical and

---

[2] *See* Second Amended Complaint RE 15, ¶¶ 27-37, PageID #133-135 (alleging that she took business classes and professed excellent budgeting and financial skills, managerial experience, and familiarity with insurance claims and managing profit and loss statements, all of which she claimed was evidence that she was "exceptionally strong candidate and would be one of the 1.5% to 3% selected out of the 21,000 applicants").

conjectural"). As in *Bolduc*, the plaintiff alleged it would be futile for her to apply to become a Delivery Service Partner, so she did not apply. *Id.* at *4. The *Alexandre* court concluded that the plaintiff could not assert standing to challenge an allegedly discriminatory policy when the plaintiff "has not yet been subjected" to the policy. *Alexandre*, 2024 WL 2445705 at *5. Thus, each of the plaintiff's alleged injuries— the same injuries alleged by Bolduc—were not sufficient grounds to prove standing.

Together, these cases highlight the critical role that injury-in-fact standing plays in "reverse discrimination" lawsuits. Roberts' lawsuit is just the latest entry in a "reverse discrimination" plaintiff attempting to water down standing when challenging grants that private individuals and businesses make available to Black and other entrepreneurs of color.

### C. Beyond private grants, courts routinely dismiss similarly thin standing allegations that seek to undermine efforts to advance equal opportunities.

Groups and individuals have not limited their attempts to subvert philanthropic efforts to advance equity for underserved communities, disproportionately Black, Latino and other communities of color. In the last year alone, litigants have brought several challenges under various civil rights and constitutional provisions against programs that aim to expand economic opportunities for diverse communities. These challenges span various sectors, including higher education, employment, and healthcare. This uptick in challenges

including Roberts', evidence a trend of reverse discrimination plaintiffs attempting to obtain judicial relief in the absence of an injury. Courts have largely rejected these attempts.

First, in *John Doe v. New York University*, an unnamed white male first year law student plaintiff alleged similarly to Roberts that he was "denied the equal opportunity to compete" for membership on NYU's Law Review. *John Doe v. N.Y. Univ.*, No. 23-CV-10515, 2024 WL 2847368, at *2 (S.D.N.Y. May 30, 2024). Specifically, he alleged, without evidence, that the Law Review's facially neutral membership-selection process gave preferential treatment to women, minorities, and gender non-conforming students, in violation of various federal civil rights laws, and that their process would result in him being discriminatorily denied a place on the Law Review. *Id.* In support of this allegation, plaintiff proffered that the Law Review "emphasizes the important role that diversity plays in the selection of its members;" requires applicants to submit a statement of interest providing a comprehensive view of themselves; and provides students the option of submitting a resume which the Law Review uses to "realize its commitment to staff diversity""—all facially neutral processes that are completely lawful. *Id.*

The court rejected such threadbare allegations. It held that "[s]uch an utter lack of specificity is insufficient to confer Doe with standing to bring this suit." *Id.* at *5. Key to the court's dismissal was that Doe's allegations that the Law Review

was engaged in discrimination were pled "in a conclusory way. . . devoid of any factual support" *id.* "and riddled with contingencies and speculation that impede judicial review." *Id.* at *4 (internal quotation marks and citation omitted). The court found that it was "a speculative leap to conclude that the Law Review is flouting its own facially neutral policy for selecting new editors and instead impermissibly relying on the sex, gender, race, or sexuality of applicants." *Id.*

Second, in *Do No Harm v. National Association of Emergency Medical Technicians*, the court denied a motion for a temporary restraining order and preliminary injunction, finding that it was not persuaded, on the limited record, that Do No Harm had standing. *Do No Harm v. Nat'l Assoc. of Emergency Med. Techs.*, No. 24-CV-11, 2024 WL 245630, at *1 (S.D. Miss. Jan. 23, 2024). Representing an unnamed member, Do No Harm alleged without basis that the National Association of Emergency Medical Technicians offered a "diversity" scholarship that "'flatly' excludes white students." *Id.* The scholarship criteria included: (1) a commitment to entering the EMS profession; (2) financial need; (3) service to their community; and (4) ability to serve as a positive ambassador for the EMS profession. *Id.* Plaintiff proffered no evidence to support the scholarship's exclusion of white students. *Id.* The court held that "in the absence of a racial requirement in the scholarship's eligibility requirements or an explicit bar against white applicants," it was forced, at this stage, to "speculate as to the injuries" Member A might suffer. *Id.* at *3 (internal

quotation marks and citation omitted). Like Roberts, the plaintiff claimed that its member intended to apply for the scholarship. *Id.* at *1. The court held that standing requirements were not satisfied at the preliminary stage in the case because the court saw "no actual barrier preventing Member A from submitting an application …" and that the member's injury was speculative at best. *Id.* at *2.

This backdrop reveals Roberts' lawsuit as one among a series of failed cases that have tried to challenge modest efforts to expand economic opportunities for historically excluded groups without pleading basic facts to establish standing. Just like Roberts, in each case the plaintiff was purportedly "ready and able" to apply for the program but pleaded no facts to show this was plausible. Courts have rightly rejected such allegations as bare statements of intent that fall below constitutional and prudential standing requirements.

In each case, a hypothetical chain of events also would have to line up just so for the prospective plaintiff to actually qualify for the race-neutral requirements of the challenged program. The same can be said for Roberts' claim here: he would have to overcome a litany of "ifs" in order to have standing, including if he could have demonstrated a "need" for a "qualifying commercial vehicle to run" his business, if he could have demonstrated a "clear plan for growth as a result", and if he was actually selected for the grant, of which only ten were available. 2024 WL

2295482, at *2, *6. As with the majority of courts faced with similar allegations, this court should reject Roberts' conclusory standing allegations.

## II.    REWRITING ARTICLE III'S STANDING REQUIREMENTS WOULD ENABLE THE WEAPONIZATION OF SECTION 1981 AND UNDERMINE THE CONGRESSIONAL INTENT OF THE ACT.

Roberts is asking the Court to rewrite bedrock principles of Article III standing so that he (and others) can attack private, remedial philanthropy programs. But by rewriting Article III's standing requirements, the Court would enable plaintiffs like Roberts to weaponize Section 1981 so that it can be used by individuals who are not in fact harmed by remedial grants, but want to undermine them nevertheless. In so doing, such lawsuits seek to stifle both economic progress for entrepreneurs of color and contravene Congress' intent in drafting and passing Section 1981 to abolish "*all badges and incidents of slavery*." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968).

In drafting Section 1981, Congress's motivation was to protect Black citizens from white citizens "whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices[.]" *John Doe v. Kamehameha Schs.*, 470 F.3d 827, 836 (9th Cir. 2006) (en banc) (internal quotation marks and citations omitted). Against this backdrop, Section 1981 should not now be weaponized by rewriting the standing requirement to challenge remedial philanthropic programs aimed at providing

opportunities for Black, Latino and other business owners of color who face greater barriers in accessing funding. Justice Stevens aptly warned his colleagues not to run afoul of "the secure foundation [] laid by others who had gone before [them]" when the Court failed to follow *Runyon v. McCrary*, 427 U.S. 160, 191 (1976), to interpret "the right 'to make and enforce contracts' as a guarantee of equal opportunity, and not merely a guarantee of equal rights." *Patterson v. McLean Credit Union*, 491 U.S. 164, 219 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, *as recognized in CBOCS W., Inc., v. Humphries*, 553 U.S. 442, 450 (2008) (Stevens, J., dissenting). After lying practically dormant for over a century, "[i]t would indeed be [] ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminat[ion]. . . ." *John Doe.*, 470 F.3d at 838 (citing *Setser v. Novack Inv. Co.*, 657 F.2d 962, 966 (8th Cir. 1981)). And yet that is precisely Roberts' aim: to undo decades of progress and impede future progress.

Opening the door to suits by individuals who are not injured-in-fact, yet claim "reverse discrimination" against remedial grant programs would cause devastating impacts to Black and Brown communities that have historically been excluded from the same economic opportunities white citizens already enjoy. Private grant programs like Hello Alice are uniquely positioned to address persistent inequities

that result from a long history of Black business owners' access to business funding, furthering Section 1981's historical remedial purpose.

For example, Black business owners have far less access to private capital than white business owners.  Alicia Robb, U.S. Small Bus. Assoc. Office of Advoc., *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms*, 3 (Feb. 2018). Even at the start, Black businesses face a funding rejection rate *three times higher* than their white counterparts. Elana Dure, *Black women are the fastest growing group of entrepreneurs. But the job isn't easy* (Oct. 12, 2021);[3] *see* Majority Staff Report, U.S. Senate Comm. on Small Bus. and Entrepreneurship, *Women's Small Business Ownership and Entrepreneurship Report*.[4] So it comes as no surprise that Black business owners are less likely to turn to traditional bank loans for financing than white business owners.  Gizelle George-Joseph and Daniel Milo, *The Bigger Picture Blackwomenomics—Equalizing Entrepreneurship* (2021).[5]

---

[3] https://www.jpmorgan.com/insights/business/business-planning/black-women-are-the-fastest-growing-group-of-entrepreneurs-but-the-job-isnt-easy.

[4] https://www.sbc.senate.gov/public/_cache/files/7/5/75d60b31-44fe-45ec-89ed-965dd86d91c7/CF3C42450C5C4E5B9AB3853329980DF5712DB498532924B25F1AFE0BCBF178C6.women-entrepreneurship-report-final-sr.pdf.

[5] https://www.goldmansachs.com/insights/articles/black-womenomics-f/black-womenomics-report.pdf.

The Federal Reserve Small Business Credit Survey Report in 2016 found that minority-owned small businesses face disproportionate challenges when seeking funding for their business:

- Black-owned firm application rates for new funding are 10 percentage points higher than white-owned firms, but their approval rates are 19 percentage points lower.

- Looking at just firms that were approved for at least some financing, when comparing minority- and nonminority-owned firms with good personal and/or business credit scores, 40% of minority-owned firms received full amount sought compared to 68% of nonminority-owned firms.

- Forty percent of nonapplicant black-owned firms did not apply for financing because they were discouraged (i.e., they did not think they would be approved), compared with 14% of white-owned firms and 21% of Hispanic- and Asian-owned firms.

Federal Reserve Bank, 2016 Small Business Credit Survey Report on Minority Owned Firms (Nov. 9, 2017).[6]

The Federal Reserve Report in 2022 found that the following racial disparities in business funding continue to persist:

- Firms owned by people of color were more likely to apply for traditional financing than white-owned firms, but they were less likely to receive the funding sought.

- Close to one in three firms owned by people of color reported a financing shortfall, compared to just one in five white-owned firms.

---

[6] https://www.fedsmallbusiness.org/reports/survey/2017/2017-report-on-minority-owned-firms.

- White-owned firms were twice as likely as Asian- and Hispanic-owned firms and three times as likely as Black-owned firms to have their financing needs met.

- Half of Black-owned firms reported unmet funding needs, compared to 45% of Asian-owned firms, 44% of Hispanic-owned firms, and 34% of white-owned businesses.

- Applicant firms owned by people of color were about half as likely as white-owned applicant firms to receive all of the financing they sought.

- Firms owned by people of color were less likely than white-owned firms to be approved for loans, lines of credit, and cash advances across banks and non-bank lenders. White-owned firms were twice as likely to be fully approved at small banks and more than twice as likely at finance companies.

- Among firms that did not apply for financing—that is, nonapplicant firms—50% of white-owned said the primary reason was that they did not need the funding. Comparatively, just 13% of Black-owned nonapplicants reported that they did not apply because they had sufficient funding, as did 27% and 26% of Asian- and Hispanic-owned firms, respectively. Compared to other firms, Black-owned nonapplicants were more discouraged about their chances of being approved.

Federal Reserve Bank, The Federal Reserve 2022 Report on Firms Owned by People of Color, ii, 13, 15, 18 (June 29, 2022).

Investment in Black-owned businesses is also unequal compared to white-owned businesses. "Black, Hispanic or Latino, and women-identifying startup founders raise a smaller share of venture capital and private equity funding than their White or non-woman peers." *Investments in Black, Latino, and Women Founded Companies in Chicago's Startup Ecosystem*, Chicago Business Bulletin (August 2022). For example, in 2022, Black founders "received only 1 percent . . . of total

US venture capital (VC) funding." Vasanth Ganesan et al., *Underestimated start-up founders: The untapped opportunity* (2023)[7]; NABA Inc., *Investing in The Future: How Supporting Black Women-Owned Businesses and Entrepreneurs Benefits Us All*, Forbes EQ Apr. 27, 2023, at 3 (noting that Black women-owned businesses receive less than 0.35% of all venture capital funding).[8] And these inequities persist even though "there is strong evidence to suggest that given the same amount of capital, [people of color] are likely to match the performance of, or even outperform, the standard founders receiving funding today." *The R.O.I. Report: Reimagining Opportunity in Venture Investing*, Transparent Collective 5 (2022).[9]

When passed, Section 1981 was meant to empower Black citizens to gain the economic power they were deprived after the end of slavery and was not intended by Congress to serve as a vehicle to cut back private, remedial measures that further economic opportunity for people of color. The seminal cases interpreting Section 1981 highlight this history and purpose. While it is recognized that Section 1981 "prohibits racial discrimination against all groups," the Sixth Circuit has explained

---

[7] https://www.mckinsey.com/featured-insights/diversity-and-inclusion/underestimated-start-up-founders-the-untapped-opportunity#/.

[8] https://www.forbes.com/sites/forbeseq/2023/04/27/investing-in-the-future-how-supporting-black-women-owned-businesses-and-entrepreneurs-benefits-us-all/?sh=24a7707e4ac2.

[9] https://docsend.com/view/7rpjy3r72ia6f7q7.

that "the majority plaintiff who asserts a claim of racial discrimination" must still do so "within the historical context of the Act." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976)).

The Court should not allow Roberts to re-write the Article III standing requirements in order to undermine remedial programs that are consistent with the Congressional intent of Section 1981. This is especially true given the continuing, and undisputed evidence that the economic marketplace continues to disadvantage Black people and other people of color as compared to white people. In an environment when programs designed to advance economic opportunity for Black communities and other communities of color are facing unprecedented attacks, refusing to hold this line will invite plaintiffs to bring baseless "reverse discrimination" lawsuits harming entities seeking to advance equal opportunities for underserved communities. The effort of Congress to abolish "*all badges and incidents of slavery*" though Section 1981 is far from completed. *Jones*, 392 U.S. at 440.

Roberts' suit aims to use Section 1981—a statute intended to concretize the promises of the Thirteenth Amendment—to cut back private, philanthropic measures intended to further racial justice. But because Roberts cannot be harmed by a grant program which he was not otherwise qualified for, he cannot succeed unless this

Court rewrites the longstanding test of injury-in-fact for Article III standing. This Court should be wary of Roberts' attempt to rewrite that requirement. Instead, this Court should stand guard against "the formidable hand of custom [that] interposed itself between [B]lacks and economic independence," *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 673 (1987), *superseded on other grounds by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) (Brennan, J., dissenting) (internal quotation marks and citation omitted).

## CONCLUSION

The Court should affirm the district court's dismissal of Roberts' lawsuit for lack of standing.

Dated:  October 25, 2024                    Respectfully submitted,

<table>
<tr><td></td><td>/s/ Keith J. Harrison</td></tr>
<tr><td>Dariely Rodriguez</td><td>Keith Harrison</td></tr>
<tr><td>Kathryn J. Youker</td><td>Mary Marston</td></tr>
<tr><td>Sabrina Talukder</td><td>Jon Del Barrio</td></tr>
<tr><td><strong>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW</strong></td><td><strong>CROWELL & MORING LLP</strong></td></tr>
<tr><td>1500 K Street NW, Suite 900</td><td>1001 Pennsylvania Avenue, N.W.</td></tr>
<tr><td>Washington, D.C. 20005</td><td>Washington, D.C. 20004</td></tr>
<tr><td>DRodriguez@lawyerscommittee.org</td><td>kharrison@crowell.com</td></tr>
<tr><td>Telephone: (202) 662-8600</td><td>Tel: (202) 624-2500</td></tr>
<tr><td>Facsimile: (202) 783-0857</td><td>Fax: (202) 628-5116</td></tr>
<tr><td></td><td>Amy Pauli</td></tr>
<tr><td></td><td><strong>CROWELL & MORING LLP</strong></td></tr>
<tr><td></td><td>1601 Wewatta St., Suite 815</td></tr>
<tr><td></td><td>Denver, CO 80202</td></tr>
<tr><td></td><td>apauli@crowell.com</td></tr>
</table>

Tel: (303) 524-8660
Fax: (303) 524-8650

Derick Dailey
**CROWELL & MORING LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
ddailey@crowell.com
Tel: (212) 223-4000
Fax: (212) 223-5116

*Attorneys for Amici Lawyers' Committee for Civil Rights Under Law et al.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief contains 4,843 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Times New Roman font.

/s/ Keith J. Harrison

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, an electronic copy of the foregoing brief was filed with the Clerk for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished upon the following counsel via the CM/ECF system.

*/s/* Keith J. Harrison