RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0150p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATHAN ROBERTS; FREEDOM TRUCK DISPATCH, LLC, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

PROGRESSIVE PREFERRED INSURANCE COMPANY; PROGRESSIVE CASUALTY INSURANCE COMPANY; CIRCULAR BOARD INC., originally named as Circular Board, LLC,

*Defendants-Appellees.*

⎤
⎟
⎟
⎟
⎟
⎟  No. 24-3454
⎟
⎟
⎟
⎟
⎦

---

On Petition for Rehearing En Banc

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:23-cv-01597—Patricia A. Gaughan, District Judge.

Argued: July 24, 2025

Decided and Filed: May 19, 2026

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

---

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas, Gene P. Hamilton, Nicholas R. Barry, AMERICA FIRST LEGAL FOUNDATION, Washington, D.C., Joseph P. Ashbrook, Julie E. Byrne, Benjamin M. Flowers, ASHBROOK BYRNE KRESGE FLOWERS LLC, Cincinnati, Ohio, for Appellants. **ON RESPONSE:** Stephanie Schuster, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellees. **ON BRIEF:** Cameron T. Norris, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, Mathura J. Sridharan, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amici Curiae.

The court delivered an order denying the petition for rehearing en banc. THAPAR, J. (pp. 3–12), delivered a separate dissental. HERMANDORFER, J. (pp. 13–14), also delivered a separate dissental, in which GRIFFIN, J., concurred.

---

**ORDER**

---

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision.  Judge Boggs would grant the petition for panel rehearing for the reasons stated in his dissent to the court's opinion of February 24, 2026.

The petition was also circulated to the full court.[*]  Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

---

[*]Judge Bush is recused.

---

**DISSENTAL**

---

THAPAR, Circuit Judge, dissenting from the denial of rehearing en banc.

If a hungry black customer—ready and willing to purchase lunch—walks up to a restaurant with a sign reading "Whites Only," does he need to open the door, request a table, and get thrown out to be harmed?  Does an Asian student need to apply for free flight credits "ONLY for Hispanic students" to be injured by the all-caps racial-eligibility rule?[1]  What about a white law student interested in one of the many "diversity" scholarships that effectively state "Whites Need Not Apply?"[2]  And how much time does that student need to spend writing essays, filling out questionnaires, and compiling recommendation letters before he has standing to sue?

Common sense tells us none of these victims of discrimination need to waste their time on such pointless efforts to challenge those programs in court.  And so does Supreme Court precedent. As the Supreme Court has made clear, plaintiffs don't need to "engage in a futile gesture" by applying for benefits that aren't available to them because of their race.  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977).  Instead of following that holding, the panel majority requires plaintiffs like Nathan Roberts to add the insult of making a futile gesture to the injury of discrimination.  We should have taken this case en banc to correct that error.  I respectfully dissent from our decision not to do so.

## I.

Progressive Preferred Insurance Company operated a program offering 10 grants ranging from $5,000 to $25,000 to help qualifying businesses purchase a commercial vehicle.  At first glance, Nathan Roberts's company seemed to meet Progressive's qualifying criteria:  It employed 10 or fewer people, earned less than $5 million in annual gross revenue, and wasn't an independent

---

[1]Statement of Interest of the United States of America at 3, *Am. All. for Equal Rts. v. Sw. Airlines Co.*, No. 3:24-CV-01209-D (SAF) (N.D. Tex. May 14, 2025).

[2]*See Am. All. for Equal Rts. v. Am. Bar Ass'n*, No. 25-CV-3980 (JBG), 2026 WL 161596, at *1, *4 (N.D. Ill. Jan. 21, 2026).

contractor for third-party rideshare and delivery services. And Roberts could satisfy Progressive's final requirement that he "demonstrate[] need" for a commercial vehicle with a plan to grow his business. R. 32-3, Pg. ID 281. So he opened the grant application and began completing it.

There was just one problem: Roberts is white. But the grant program "aim[ed]" to address "how inequities have made it harder for Black entrepreneurs to access capital." *Id.* at 280. So Progressive offered the grants only to businesses that were majority owned and operated by at least one "Black-identifying entrepreneur[]." *Id.* at 281. When Roberts reached a part of the application that "made clear that the grants were available only to black-owned businesses," he closed the application without submitting it. R. 32, Pg. ID 267. After all, in exchange for completing the application, Roberts would have to agree to allow Progressive to use his personal information for cross-selling and marketing. And why would he hand over his information (and receive annoying marketing emails) if his race guaranteed he wouldn't receive the grant?

Roberts then sued Progressive and Circular Board, the online program Progressive used to administer the grant. *See* 42 U.S.C. § 1981. He alleged that he satisfied Progressive's eligibility criteria—except for his race. As a result, he claimed the defendants injured him by "den[ying him] the ability to enter into contracts with" them based on his race. R. 32, Pg. ID 267. The district court dismissed his claims for lack of standing, and a panel of this court affirmed over Judge Boggs's thoughtful dissent. *See Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955 (6th Cir. 2026). The panel majority assumed that Roberts had suffered an injury in fact but concluded that he couldn't establish causation because his choice not to submit the application made his injuries "self-inflicted." *Id.* at 962.

## II.

"Courts sometimes make standing law more complicated than it needs to be." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 523 (2026) (quotation omitted). This is one of those cases. First, Roberts didn't cause his own injury. Second, and relatedly, Supreme Court precedent instructs that Roberts didn't need to perform the "futile gesture" of completing the grant application to have standing. Third, the panel majority wrongly rejected Roberts's "unequal-footing" theory of injury—simply because he included a different theory in his complaint. Our

refusal to review the panel's opinion ensures that future civil-rights plaintiffs will feel the ripple effects of these mistakes.

## A.

Roberts sued under 42 U.S.C. § 1981, which prohibits private actors like Progressive and Circular from discriminating against his right to "make and enforce contracts."  42 U.S.C. § 1981(a), (c).  He alleged that Progressive's grant-application process involved two contracts. First, an applicant entered an "application-stage contract" by agreeing to Progressive's and Circular's terms and conditions.  Under that contract, an applicant permitted the defendants to use and sell his personal information in exchange for the chance to compete for the grant.  Second, if an applicant won the grant, he would enter a "grant-stage contract" where he would agree to use the funds to purchase a commercial vehicle.

But there was one catch:  The terms and conditions governing both the application-stage and grant-stage contracts said that to be "eligible for th[e] opportunity" to compete for the grant, the business must be "owned and operated by a Black-identifying entrepreneur[]."  R. 32-3, Pg. ID 281.  So the panel's conclusion that "there was no race-based barrier preventing Roberts from entering into the application-stage contract" isn't true.  *Roberts*, 167 F.4th at 963.  If Roberts had clicked "submit," he could have sent a form to Progressive.  But he couldn't have *entered the contract* because Progressive had already declared him ineligible based on his race, plain and simple.

Because of these terms, Roberts had standing.  The "denial of equal treatment resulting from the imposition of" a race-based barrier is an injury in fact.  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Vitolo v. Guzman*, 999 F.3d 353, 358–59 (6th Cir. 2021).  Roberts didn't impose that barrier—Progressive and Circular did.  So they caused his injury, which means he has standing.

## B.

According to the panel, Roberts could have entered the application-stage contract simply by clicking "submit." *Roberts*, 167 F.4th at 962.  So, the argument goes, Roberts caused his own

injury by closing the application, which means his injury isn't fairly traceable to the defendants' conduct. *Id.* And without traceability, he lacks standing. *Id.*

But the panel majority's causation analysis effectively penalizes Roberts for not sending a form he knew Progressive wouldn't accept. That defies Supreme Court precedent. In *Runyon v. McCrary*, the Court permitted a black mother to sue a segregated private school under § 1981 for both injunctive relief *and* damages, even though she never submitted an application for her son to attend. 427 U.S. 160, 164–65 (1976). Even without an application, "the racial exclusion . . . amount[ed] to a classic violation of § 1981" because the plaintiffs "sought to enter into contractual relationships" with the school and were denied due to race. *Id.* at 172. So the child and his parents received compensatory damages for the "embarrassment, humiliation, and mental anguish" caused by the school's discrimination.[3] *Id.* at 166 n.4. Those damages remedied a harm that occurred before the application process started: the school's refusal to deal with the child because of his race.[4] *Cf. Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984). In short, the Court didn't require the plaintiffs to file a futile application before suing for damages.

Similarly, in the Title VII context, the Court has clarified that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture[,] he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Teamsters*, 431 U.S. at 365–66. After all, an employer who "announce[s] his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door" discriminates against both would-be applicants and those "few who ignored the sign and

---

[3]The plaintiffs received compensatory damages because a completed injury occurred at the time they chose not to apply due to the schools' racial barriers. *See id.* at 172. That injury gave them an unequal-treatment claim for both prospective *and* retrospective relief under § 1981. *See McCrary v. Runyon*, 515 F.2d 1082, 1089 (4th Cir. 1975), *aff'd*, 427 U.S. 160 ("If [§ 1981] is to be enforced fairly, if injuries suffered directly because of its violation are to be fairly compensated, damages for embarrassment and humiliation must be recoverable in a case such as this."); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (authorizing nominal damages for "a completed violation of a legal right"). Ultimately, the *amount* of compensatory damages (and what kinds of harm a plaintiff can show) is a remedial question that courts must resolve after finding liability—not at the standing stage.

[4]Of course, a plaintiff doesn't have standing if he simply asserts a generalized grievance against a discriminatory policy. *Cf. Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984). Rather, he must be otherwise qualified to receive the benefit that he was denied because of his race. As *Runyon* makes clear, an applicant is subject to discrimination when he is ready, willing, able, and otherwise qualified to apply—but a racial bar stops him. 427 U.S. at 164–65. Like the plaintiff in *Runyon*, Roberts was otherwise qualified and wanted to apply—so much so that he started the application.

subjected themselves to personal rebuffs." *Id.* at 365. The Court's conclusion was based on a commonsense understanding of the purpose and result of discriminatory application policies: to deter unwanted applicants from applying in the first place. *See id.* So the Court found that a plaintiff who would have applied but didn't because of the discriminatory policy was still entitled to "retroactive relief." *Id.* at 364. That squarely contradicts the panel majority's insistence that Roberts "subject [himself] to the humiliation of explicit and certain rejection" by submitting a form that Progressive would surely reject. *Id.*

The panel majority minimized these cases because they didn't mention standing. *Roberts*, 167 F.4th at 964. But the Supreme Court's refusal to require "futile gestures" applies with equal force to standing in cases like this one. In fact, the Court has clearly stated in the standing context that "a plaintiff need not translate his or her desire for a [benefit] into a formal application where that application would be merely a futile gesture." *Carney v. Adams*, 592 U.S. 53, 66 (2020) (cleaned up) (quoting *Teamsters*, 431 U.S. at 365–66). That principle is nothing new. *See, e.g.*, *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982) (explaining that because applicants "would not have been granted a [benefit] had they applied for one," their "failure to submit an application therefore does not deprive them of standing"). Our sister circuits have also applied the "futile gesture" doctrine in standing cases. *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 774 (11th Cir. 2024) (holding that plaintiffs "ready and able" to apply for racially exclusionary grants need not "enter[] the competition and prompt[] a certain rejection" because "Article III doesn't require so futile a gesture"); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (per curiam) (similar). Because the "futile gesture" rule also applies to standing, the panel majority should have applied it here.

Requiring Roberts to complete Progressive's application may seem like a pretty light burden (if you don't mind giving away your personal information and receiving marketing emails). But how many hours will we require future plaintiffs applying for discriminatory benefits to sink into futile gestures? What if a competition included essays? Could a company impose a 100-page application to protect itself from litigation, hoping that no plaintiff would be intrepid enough to actually submit it? The Supreme Court has already told us none of that pretense is necessary. *Carney*, 592 U.S. at 66; *Teamsters*, 431 U.S. at 365–66. But the panel majority's decision forces

future panels to decide whether plaintiffs must complete increasingly burdensome applications to be injured.  I don't envy the task of searching Article III's penumbras to discover how many hours of futile effort are required to establish standing.

C.

Roberts also alleged that Progressive didn't allow him to compete for the ultimate grant-stage contract on equal footing due to his race.  *Roberts*, 167 F.4th at 965, 973 (Boggs, J., dissenting).  The panel rejected that "unequal-footing" theory of injury because Roberts didn't raise it in his complaint.  *Id.* at 964 (majority opinion).  But Roberts is limited to the facts—not the legal theories—identified in his complaint.  The panel's approach misreads relevant precedent and again distorts standing doctrine.

The majority opinion stated that "Roberts's own legal theory" is "the theory by which we must evaluate his standing."  *Id.*  That's not exactly right.  The majority cited cases discussing the uncontroversial principle that we must assume a plaintiff wins on the merits when analyzing whether he has standing.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Merck v. Walmart, Inc.*, 114 F.4th 762, 772 (6th Cir. 2024).  That rule helps ensure that courts don't decide merits questions until their jurisdiction to do so is clear.  But that basic Article III requirement doesn't mean we can consider only the theory of injury in a plaintiff's complaint.

Parties aren't limited to the theories in their complaints.  After all, the Federal Rules of Civil Procedure don't require plaintiffs to plead their legal theories perfectly.  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[A] complaint need not pin plaintiff's claim for relief to a precise legal theory.").  So conversely, the Rules don't allow "dismissal of a complaint for [an] imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).  To survive a motion to dismiss, a plaintiff must merely "plead factual allegations that impliedly establish[] at least one viable theory."  *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021).  After that, the plaintiff can refine his theory of injury and respond to opposing legal theories.

That rule applies equally to standing questions because "[w]e assess a complaint's standing allegations using the same rules that we would apply for the merits."  *CHKRS, LLC v. City of*

*Dublin*, 984 F.3d 483, 488 (6th Cir. 2021). If a plaintiff's complaint includes factual allegations that show an injury in fact, we can evaluate standing based on any presented theory of injury stemming from those facts—even if the plaintiff offered an alternative theory in his complaint. And Roberts raised his "unequal-footing" theory both to the district court and on appeal.[5] So the panel was wrong to limit Roberts to the single theory of injury in his complaint when he alleged facts that also supported an unequal-footing injury. And it was doubly wrong to say our precedent requires that limited view.

### III.

There's one final reason why we should have reheard this case: to clarify this court's opinion in *Aiken v. Hackett*, 281 F.3d 516 (6th Cir. 2002). The district court relied on a broad reading of *Aiken* to conclude that Roberts needed to show he *would* have received one of Progressive's available grants. *Roberts v. Progressive Preferred Ins. Co.*, No. 1:23-CV-1597 (PAG), 2024 WL 2295482, at *6–7 (N.D. Ohio May 21, 2024). But applying such a heightened standing requirement to plaintiffs like Roberts violates first principles and isn't required by Supreme Court precedent.

So we also should have taken the case to clarify that *Aiken*'s holding is limited: A plaintiff lacks standing to challenge an affirmative action program when the record definitively shows he couldn't have received a benefit even without that program. 281 F.3d at 518, 520. But *Aiken* is miles away from cases like this one, in which the plaintiff *could* have received the benefit without the discriminatory policy in place.

Start with *Aiken* itself. The Memphis Police Department planned to fill 94 open sergeant positions by promoting officers with the highest numeric scores on a performance assessment. *Id.* at 518–19. And the Department had an affirmative action program that guaranteed black officers would fill at least 33 of those vacancies. *Id.* at 518. But only 15 black officers scored in the top 94 on the performance assessment. *Id.* Thus, the City "bumped" 18 white officers who scored in the top 94 to promote an additional 18 black officers to meet its quota. *Id.* The problem in *Aiken*?

---

[5]Indeed, Roberts claimed the injury of unequal footing in his response to the defendants' motion to dismiss, before the panel, and in his petition for en banc review.

None of the plaintiffs scored within the top 94. *Id.* So the plaintiffs weren't "bumped" by the black officers; other white officers were. *Id.* Naturally, the plaintiffs lacked standing to sue over promotions they *could not* have received even without the affirmative action program. *Id.* at 519.

But *Aiken* also stated that plaintiffs seeking compensatory damages based on racial discrimination must "allege and show that 'under a race-neutral policy' they *would have* received the benefit." *Id.* (emphasis added). Such an extreme requirement makes no sense in cases like this one, which involve benefits awarded based on pure, unfettered discretion. For instance, how could an Asian college applicant definitively show that her race cost her admission to Harvard when the university uses an individualized, holistic review process? Of course, she wouldn't— and didn't—need to. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199, 201 (2023). If *Aiken* bars such cases by imposing a heightened standing requirement, it's wrong.

Fortunately, our court hasn't read it that way. *Aiken*'s holding concerned plaintiffs who indisputably *couldn't* receive a benefit. So it has no binding force in cases where the plaintiff alleges he *could*. *See Wright v. Spaulding*, 939 F.3d 695, 701–02 (6th Cir. 2019). We've summarized its narrow rule as follows: "If a plaintiff lacks the ability to take advantage of an opportunity, the deprivation of that opportunity does not count as an injury under Article III." *Carroll v. Hill*, 37 F.4th 1119, 1122 (6th Cir. 2022) (citing *Aiken*, 281 F.3d at 519–20). The district court was therefore wrong to apply *Aiken* when Roberts was otherwise eligible to take advantage of Progressive's grant opportunity.

Reading *Aiken* this way has the added benefit of aligning us with our sister circuits. Those courts have also distinguished between plaintiffs who *could* and those who *could not* receive a benefit. *See, e.g.*, *Donahue v. City of Boston*, 304 F.3d 110, 117 (1st Cir. 2002); *Grahek v. City of St. Paul*, 84 F.3d 296, 299 (8th Cir. 1996); *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1181, 1185–86 (9th Cir. 2012). These cases look almost exactly like *Aiken*—the plaintiffs alleged facts showing they *could not* have received the racially limited benefit, regardless of any racial criteria. *See Donahue*, 304 F.3d at 116–17 (hundreds of non-minority applicants beat plaintiff); *Grahek*, 84 F.3d at 297 (plaintiffs didn't score high enough to qualify for promotion); *Braunstein*, 683 F.3d at 1186 (contractor wouldn't have received work regardless of discriminatory criteria).

On the flip side, the Eleventh Circuit—dealing with a plaintiff who *could have* received the highly discretionary benefit of college admission—reached the opposite result and found standing. *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1277 n.14, 1279 (11th Cir. 2001). That's exactly what we should have done here.

In sum, we should read *Aiken* for this simple proposition: If a company announced that it would hire only black people *with* a college degree, a white person *without* a college degree lacks standing to challenge the policy. No matter his race, he couldn't be hired. But barring a white person *with* a college degree from suing just because he can't show with certainty how the hiring process would shake out goes too far—especially on a motion to dismiss. Supreme Court precedent requires such a plaintiff to show only that he *could* receive the benefit, not that he *would* receive it. *Texas v. Lesage*, 528 U.S. 18, 21 (1999). Insofar as *Aiken* says otherwise, it conflicts with both precedent and principle.

\*        \*        \*

The panel's approach rewards gamesmanship by companies seeking to avoid liability for blatant race discrimination. Companies awarding benefits to some races, but not others—all in the name of "equity"—follow a well-worn playbook when challenged: Shut down the program, claim mootness, and try to kick the case for lack of jurisdiction—just like Progressive did here. *See, e.g.*, *Fearless Fund*, 103 F.4th at 775 & n.4; *Am. All. for Equal Rts. v. Sw. Airlines Co.*, No. 3:24-CV-1209-D (SAF), 2024 WL 5012055, at \*1 (N.D. Tex. Dec. 6, 2024) (challenging program offering free flights for Hispanic students). This gamesmanship shields companies from suits for prospective relief, since the program is no longer running.

The panel's decision now means that plaintiffs "unwilling to subject themselves" to the indignity of making a futile gesture will lack standing to obtain remedies for discrimination. *Teamsters*, 431 U.S. at 365. And moving forward, savvy companies will simply make their applications more onerous. After all, the harder the application process, the more insulated the discrimination will be from suit.

This country hasn't always lived up to the Declaration of Independence's promise that "all men are created equal." But this nation fought a Civil War, amended the Constitution, and passed

numerous laws to prevent discrimination and right those wrongs.  Corporations like Progressive may genuinely hope to contribute to those efforts.  But they can't violate the law—and perpetuate more discrimination—in the name of equality.  *See Students for Fair Admissions*, 600 U.S. at 232 (Thomas, J., concurring) ("Two discriminatory wrongs cannot make a right.").  And if they do, we have an obligation to keep the courthouse doors open to those injured by discrimination.  The Supreme Court said it best:  "[T]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race."  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007).

I respectfully dissent.

―――――――――――

**DISSENTAL**

―――――――――――

HERMANDORFER, Circuit Judge, dissenting from the denial of rehearing en banc.

When it comes to assessing Article III standing to challenge race-based programs, governing law makes two things clear.  First, the relevant injury inflicted by a racial exclusion "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) ("inability to compete on an equal footing" is an "injury in fact" (citation omitted)).  Second, nominal relief alone can redress legal injuries when a plaintiff otherwise lacks "actual damage."  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 289 (2021) (citation omitted).  So those who were "able and ready" to compete for contracts, yet couldn't because of their race, have standing to vindicate their "equal footing" injuries. *Jacksonville*, 508 U.S. at 666.  And standing lies even if the only available relief is nominal damages for a race-based exclusion that's since been shuttered.

Those standing rules should be simple enough to apply.  And they would unquestionably permit plaintiffs' challenge to Progressive's race-based grant program.  But this Court's decision in *Aiken v. Hackett*, 281 F.3d 516 (6th Cir. 2002), has muddied the waters.  The problem is stray language in *Aiken* that suggests a more stringent standing test for equal-footing plaintiffs—one in which such plaintiffs lack standing to seek retrospective relief absent allegations that they "would have received the benefit" at issue "under a race-neutral policy." *Id.* at 519 (citation omitted).

Like others, I'm dubious that *Aiken* should—or under Supreme Court precedent, could— be read to impose a sky-high standing hurdle that would "functionally immunize[] from judicial review" any number of racially discriminatory programs.  *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 968 (6th Cir. 2026) (Boggs, J., dissenting).  But as it turns out, courts and litigants have understood *Aiken* that way.  That includes the district court here, which held that *Aiken* foreclosed standing because plaintiffs did "not allege anywhere" that they "would have received" one of Progressive's grants "under a race-neutral policy."  D. Ct. Order, R.51, PageID

619; *see also* Mot. to Dismiss, R.34, PageID 340-41 (similar).  Other circuits have described *Aiken* similarly.  *See Donahue v. City of Boston*, 304 F.3d 110, 118 (1st Cir. 2002) (contrasting *Aiken* with *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262 (11th Cir. 2001)).

At a minimum, *Aiken*'s sketchy scope significantly distorted the standing inquiry in this case.  Discrimination caselaw should have confirmed plaintiffs' equal-footing standing to challenge the express racial barrier to Progressive's grant program.  Instead, things devolved into a convoluted dispute over plaintiffs' "two-contract" theory and the distinct contractual phases of the program's application process.  *Roberts*, 167 F.4th at 961; *see also* Roberts Br. 16-21.  But parsing the mechanics of how someone could have sought a race-based grant he was bound to lose is beside the point for Article III purposes.  And it likely would have been, but for the shadow *Aiken* casts on parties' rights to seek retrospective relief in cases challenging race-based programs.

Beyond the litigation here, *Aiken*-related confusion might deter parties from pressing meritorious suits for fear that they lack standing.  So too, denying standing to seek retrospective relief can thwart accountability for past discriminatory acts by permitting sponsors to fold race-based programs rather than face victims' challenges.  *See* Am. All. for Equal Rights Amicus Br. 6-8 (providing examples).  *Aiken* thus risks hampering our Court's ability to address instances of racial discrimination that would be subject to scrutiny in other circuits.

The redress available for those subjected to race-based barriers in contracting is an important question worth clarifying.  And if this suit's anomalous no-standing result is any indication, clarification is needed.  I would therefore grant the petition for rehearing en banc and respectfully dissent from the Court's decision not to do so.

ENTERED BY ORDER OF THE COURT

*Kelly L. Stephens*

_____

Kelly L. Stephens, Clerk